THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO McCARROLL, Defendant-Appellant.

First District (5th Division) No. 85—2967

Opinion filed April 15, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (Georgeen M. Carson, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Joan E. Disis, and Jerome F. Marconi, Jr., Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial defendant Antonio McCarroll was convicted of murder and received a 25-year prison sentence. On appeal defendant contends: (1) the trial court erred when it refused to instruct the jury on involuntary manslaughter; (2) defendant was deprived of a fair trial when the prosecutor told the jury that accident was not a defense to murder; (3) other prosecutorial comments were also improper and prejudicial; (4) the prosecutor's cross-examination of the defendant improperly suggested that defendant was a drug addict; and (5) the prosecution improperly adduced evidence about the family of the deceased which was calculated to arouse the sympathies of the jury.

We reverse and remand for a new trial.

The pertinent trial evidence was as follows. Marvin Pittman testified that on April 8, 1984, he was working at a gas station in Chicago with the deceased, David Brown. At about 8:45 p.m. the defendant came into the station. Pittman had seen defendant at the station before but did not know his name or where he lived. Defendant asked Pittman for a pack of cigarettes, displaying a $20 bill. Pittman told him to wait for Brown, who had gone to the washroom. Instead defendant walked toward the washroom, meeting Brown on the way. Defendant apparently startled Brown and according to Pittman Brown was angry about this. Pittman stated that several hours earlier Brown had been drinking a small amount of whiskey. Brown sold defendant the cigarettes and gave him his change from the $20 bill before going outside to wait on a customer.

According to Pittman defendant walked up to a television set on the counter and asked Pittman if he wanted to buy another one. Pittman said no. Defendant took a few steps back, pulled out a gun, and threatened to kill Pittman if he moved. Defendant then took from under a counter a gun which, according to Pittman, Brown customarily kept there. Defendant asked Pittman if there was anything else in the gas station. Pittman said there was not. At this moment Brown rushed in and defendant turned the gun toward him. Brown grabbed defendant in a bear hug and Pittman heard a shot fired. When the

two men fell against a soft drink machine, Pittman took Brown's gun from defendant's pocket. With Brown still holding him in a bear hug defendant fired a second shot. Brown fell and defendant ran for the door. Pittman shot at him six times as he fled. On cross-examination Pittman stated that earlier in the evening, while drinking, Brown had kept the gun in his belt.

The examining pathologist testified that the cause of Brown's death was a bullet wound to the chest, fired at close range. The decedent's blood-alcohol content indicated that he had consumed the equivalent of three to four shots of whiskey.

Testifying in his own behalf, defendant admitted that he walked to the gas station with a loaded .9 millimeter automatic pistol in his waistband. He stated that he had been jumped and stabbed the week before and the gun was for his protection. He went to the station, which he had visited 30 or 40 times before, to buy cigarettes. Defendant gave Brown $20 for the cigarettes but Brown refused to give him change, claiming to have only received $1. Brown swore at defendant and repeatedly told defendant to leave, but he refused to do so. Brown then walked toward where Pittman was sitting. In a window reflection defendant could see Brown reaching for a gun in his waistband. Defendant rushed Brown and grabbed him from behind, causing Brown's gun to fall to the floor. Brown broke defendant's grip, turned around, and grabbed defendant in a bear hug. Defendant then felt Brown lifting defendant's gun from his waistband. Defendant grabbed for the gun and they both struggled with it. They both had a hand on it when two shots went off in rapid succession. Brown fell to the floor.

Defendant testified that he went out the door about 10 feet. He was standing there, with the gun still in his hand, when Pittman came out and began shooting at him, striking him twice. Defendant fled, dropping his gun in an alley. Defendant stated he did not report this incident to the police because he was frightened. He admitted that he lied to a health worker at a clinic when he sought medical attention, telling her that he received his injuries by falling and cutting himself. He also admitted that when arrested he lied to the police, telling them that he had no gun and that it was Pittman who shot Brown when defendant was struggling with Brown.

Defendant also testified that the police saw a puncture wound which he had received in the earlier knife attack on him. However, in rebuttal two police detectives testified that they had not seen such a wound.

Defendant had been charged with two counts of intentional mur-

der and two counts of felony murder. The latter two counts arose from charges of armed robbery, based on defendant allegedly taking Brown's gun from the counter at gunpoint, and attempted armed robbery, based on defendant then asking Pittman, at gunpoint, if there was anything else in the gas station. However, because defendant was acquitted of armed robbery and attempted armed robbery, the State concedes that his murder conviction was based on one of the intentional murder counts.

OPINION

I

■ We first consider defendant's contention that he was entitled to instructions on involuntary manslaughter. The trial court apparently refused to give such instructions because defendant was charged with felony murder. Where the sole murder charge against a defendant is based on felony murder, no involuntary manslaughter charge need be given. (*People v. Weathers* (1974), 18 Ill. App. 3d 338, 309 N.E.2d 795.) This is because felony murder is based on strict liability for one who kills or is responsible for a killing during the commission of a felony. Thus, if death resulted from recklessness or even accident during the commission of the underlying felony, the defendant would still be guilty of felony murder. Although the argument portion of the instructions conference was held off the record, the State's arguments concerning this instruction at the hearing on defendant's motion for a new trial indicate that this was the basis of the court's refusal of the instructions.

■ But this defendant was also charged with intentional murder, and therefore, if there was some evidence which would reduce murder to involuntary manslaughter, he was entitled to an instruction on that lesser offense. (*People v. Boisvert* (1975), 27 Ill. App. 3d 35, 325 N.E.2d 644.) Indeed, because defendant was acquitted of the two underlying felonies, he could not have been convicted of felony murder.

Section 9—3(a) of the Criminal Code of 1961 (Code) provides in pertinent part:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).

Recklessness is defined in section 4—6 of the Code, which states:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1985, ch. 38, par. 4—6.)

A review of several Illinois cases concerning involuntary manslaughter establishes that the facts in this cause justified an instruction on that offense. In *People v. Robinson* (1987), 163 Ill. App. 3d 754, 516 N.E.2d 1292, the defendant asserted that while trying to make peace with the decedent, with whom he had quarreled earlier, he saw the decedent's companion pull out a shotgun. The defendant grabbed for the gun and in the ensuing struggle the gun fell to the ground and discharged, killing the decedent. This court held that an involuntary manslaughter instruction should have been given based on this evidence because a jury could have disbelieved defendant's claim of self-defense and still found his actions to be reckless. In *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497, the defendant, armed with a knife, confronted his estranged wife when she returned home. The defendant held the knife to his wife's throat and asked her about her relationship with the decedent, who was outside the house. The wife fled outside, followed by the defendant, who encountered the decedent on the landing. The decedent grabbed the defendant, who still had the knife, and they scuffled. Defendant backed away and pursued his wife. The decedent received a stab wound to the back and ultimately died of complications arising from it. Defendant did not recall stabbing the decedent. He testified that he held the knife to his wife's throat only to persuade her to tell the decedent to leave so defendant could talk to his wife alone. The appellate court held that if the jury had believed defendant they could have concluded that he knew or should have known that handling the knife in the manner he did created a strong possibility of death or great bodily harm. Thus an involuntary manslaughter instruction should have been given. In *People v. Falkner* (1978), 61 Ill. App. 3d 84, 377 N.E.2d 824, evidence strikingly similar to that before us was held to support an involuntary manslaughter conviction. There the defendant came into a bar armed with a gun because he claimed to have been robbed twice before. The defendant testified that he gave the bartender a $50 bill for a drink but only received change for $20. He demanded his money at gunpoint and was grabbed by bystanders, one of whom was killed when

the gun discharged. On appeal the court found that no felony murder based on armed robbery was committed because a reasonable doubt existed that defendant may have believed that the money was rightfully his. However, the court reduced defendant's conviction to one for involuntary manslaughter, finding that defendant's action in pulling a loaded gun in a crowded bar to force the return of his money was reckless and likely to cause death or great bodily harm.

■ In this cause the defendant testified that he was armed when he entered the gas station because he had been attacked in that neighborhood a week earlier. He purchased cigarettes with a $20 bill but was refused change by the decedent, who claimed he had received only $1. Defendant insisted on being given his change, even though the decedent was swearing at him and telling him to leave. When the decedent began to pull out a gun the defendant rushed him and grabbed him from behind, causing the decedent's gun to fall to the floor. As they struggled the decedent began to pull out defendant's gun from defendant's waistband. Defendant grabbed for the gun and both men struggled with it. As they struggled the gun fired twice, the decedent was struck, and defendant fled.

Based upon this evidence the jury could have found that defendant behaved recklessly when he came to the gas station armed with a loaded gun and then rushed and grabbed the armed decedent in the confines of the gas station while still carrying his gun in his waistband. Such a finding of recklessness would have supported a verdict of involuntary manslaughter.

Evidence at trial also supports an involuntary manslaughter instruction on an alternative basis. The jury clearly did not believe the entirety of State eyewitness Pittman's story, for they acquitted defendant of armed robbery and attempted armed robbery despite Pittman's testimony that defendant held a gun on him while pocketing the gun from the shelf and asking if there was anything else in the gas station. But the jury may have believed that defendant did first pull his gun out and point it at the decedent in an attempt to obtain the change from the $20 bill, precipitating a struggle in which the decedent was killed when the gun discharged. Like the court in *Falkner*, the jury here could have found these actions to be reckless and likely to cause death or great bodily harm. Either of these alternative findings would have supported a conviction of involuntary manslaughter. Accordingly, the trial court erred in refusing this instruction and defendant's conviction must be reversed and the cause remanded for a new trial.

## II

██ A second contention of the defendant also supports a finding that defendant was deprived of a fair trial. The defendant's primary theory at trial was accident; that the gun accidentally discharged while he struggled for it with the decedent. Juries need not be separately instructed on accident in intentional murder cases because it is deemed to be implicit in the instructions concerning intent in intentional murder that accident would negate such intent. (*People v. Spaulding* (1979), 68 Ill. App. 3d 663, 386 N.E.2d 469.) Thus in this case at the instructions conference no such instruction was requested. Knowing this, the prosecutor here told the jury that if the judge did not tell them accident was a defense, it was not one. Although the court sustained defendant's objection and instructed the jury to disregard the statement, the jury was of course not instructed on accident and may well have believed defendant's sole defense to be unavailable. The egregious and calculated nature of this comment by the prosecutor, coupled with the court's erroneous refusal of the involuntary manslaughter instruction, deprived defendant of a fair trial.

Because of our disposition of these issues we do not reach the remainder of the defendant's contentions on appeal. The judgment of the circuit court is reversed and the cause remanded for a new trial.

Reversed and remanded for a new trial.

PINCHAM and MURRAY, JJ., concur.