THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LETORRIES CAUSEY, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NORMAN WALLACE, Defendant-Appellant.

First District (6th Division)   Nos. 1—01—1984, 1—01—2590 cons.

Opinion filed June 27, 2003.

Rita A. Fry, Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Jane Liechty Loeb, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GALLAGHER delivered the opinion of the court:

Following simultaneous jury trials, defendants Letorries Causey[1] and Norman Wallace were convicted of the first degree murder and armed robbery of Ricardo Epps. The trial court sentenced each defendant to 52 years for murder and a concurrent 20-year sentence for armed robbery. On appeal, Causey contends that his counsel was ineffective for failing to renew his motions to quash his arrest and suppress his statement after two police detectives testified at trial that Causey did not confess his involvement in Epps' murder until he had been at the police station for approximately 19 hours. In addition, both defendants assert that the jury was improperly instructed as to the legal definition of felony murder and that their sentences are excessive. For the reasons stated below, we affirm defendants' convictions. However, because each defendant's sentences must be served consecutively and not concurrently, we remand this case to the trial court for resentencing.

Epps was assaulted and murdered in the early morning hours of October 19, 1997, and his body was found in a lot in the 800 block of North Sedgwick Street in Chicago. A nearby 55-gallon garbage can was bloodstained, blood spatters were found on the grass, and pieces of trash were scattered about. An autopsy indicated that Epps died of blunt head trauma due to an assault. Police located no witnesses to the crime. Approximately 18 months later, Causey and Wallace were arrested and charged with Epps' murder.

At a hearing on Causey's motion to quash his arrest, the trial court heard the following relevant testimony. Causey testified that between 9:30 and 10 p.m. on April 24, 1999, three police officers stopped him as he walked down Larrabee Street. The officers handcuffed Causey and took him to a police station at Chicago and Clark, where he was strip-searched. Causey testified he was 20 years old at the time and that the officers knew him and had stopped him two or three times before.

In opposition of Causey's motion, Chicago police detective Barrett J. Moran testified that in February 1999, he was assigned to investigate Epps' murder. Moran reviewed police reports indicating that an eyewitness to the murder had identified several suspects, including Causey. At about midnight on April 24, two officers brought Causey to Area 3 police headquarters. When Detective Moran spoke to Causey about an hour later, at 1 a.m. on April 25, Causey sat in an unlocked interview

---

[1]Throughout the record and briefs, Causey's first name is spelled both Lettories and Letorries. We adopt the latter spelling, which Causey offered in his testimony.

room and was not handcuffed. At that time, Causey confessed his involvement in Epps' murder. Moran stated that Causey was brought to Area 3 for an interview and that he had been free to leave until he made his inculpatory statement.

Chicago police officer Thomas Parham testified that he and his partner stopped Causey and told him that Area 3 detectives wanted to speak with him. He testified that Causey voluntarily accompanied them to the station. Although the officer patted Causey down before Causey got into the squad car, Causey was not handcuffed or searched. Contrary to Causey's testimony, the officers did not strip-search him or take him to Chicago and Clark. The trial court denied Causey's motion to quash his arrest, finding that Causey voluntarily went to Area 3.

The trial judge then heard testimony on Causey's motion to suppress his statement. Detective Moran testified that he first spoke with Causey at about 12:30 or 1 a.m. on April 25. Detective Robert Browne was also present. Causey was not handcuffed. Detective Moran read Causey his *Miranda* rights. After about 45 minutes, the detectives left the room. The detectives returned 10 minutes later and spoke with Causey for another 15 or 20 minutes. Detective Moran showed Causey several photographs of people that Causey had mentioned. The detectives spoke with Causey again for about 15 minutes, until approximately 3 a.m.

Detective Moran testified that he, Detective Browne and Cook County Assistant State's Attorneys Trev Minert and Tony Benish met with Causey between 11 p.m. on April 25 and 2 a.m. on April 26. During that time, Causey did not ask for an attorney or to call his family and was not handcuffed. The detective stated that Causey was never beaten, threatened or told what to say.

On cross-examination, Detective Moran said that according to the arrest report, Causey was arrested at 12:30 a.m. on April 26. Regarding his first conversation with Causey at about 1 a.m. on April 25, Detective Moran stated that he read Causey the *Miranda* warnings prior to the interview. Causey told the detective he was nearby when Epps was killed. Causey then said two people approached him and asked him to be a lookout while they attacked and robbed a man whom they thought had money. Causey said the victim was hit in the head with a garbage can and that he kicked the victim a few times. Causey said he was supposed to "get money for it" but that he did not receive any money.

Detective Moran stated that as of 1 a.m. on April 25, Causey had not incriminated himself in Epps' murder. Causey's counsel impeached the detective with his prior testimony that Causey had confessed his

involvement in Epps' death by that time, to which Detective Moran replied that Causey had started to give a statement at 1 a.m. The detective denied that he or Detective Browne kicked, choked or threatened Causey or prevented Causey from making a phone call. On redirect examination, he said Causey was arrested "when we finished our whole investigation."

Assistant State's Attorney Benish testified that at about 4 a.m. on April 26, Causey gave a statement recorded by a court reporter. Benish read portions of the statement in which Causey said he was given food and drink and allowed to smoke and use the bathroom. Benish said Causey was not threatened or coerced into making his statement.

Causey testified, reiterating his account of being strip-searched at Chicago and Clark. Causey said he was handcuffed while the detectives drove to Area 3, where they led him to a small windowless room and handcuffed him to a wall. Causey said he told the detectives he did not know Epps. Causey said he was not read his *Miranda* rights or allowed to call his grandmother. Causey said the detectives choked and pushed him and that his inculpatory statement reflected what they told him to say. On cross-examination, Causey admitted he had been arrested 22 times for various offenses. The parties stipulated that Causey had a 1998 felony conviction for possession of a controlled substance.

The trial court denied the motion to suppress Causey's statement, finding that the statement was intelligently, knowingly and voluntarily made. The trial court determined that in light of the testimony that police were investigating other suspects while questioning Causey, it was reasonable that Causey was not charged with a crime immediately after his initial interview. Although the court found that Causey's initial statement "perhaps was not quite as inculpatory as Detective Moran made it out," the court found Causey's testimony to be not credible.

At trial, the State established that police sought to question several men regarding Epps' murder, including Wallace (nicknamed Big Spank), Floyd Rogers (Fuzz), Lorenzo Williams (Zoe) and two other men. Detective Browne testified that at about 1 a.m. on April 25, he and Detective Moran questioned Causey about Epps' murder. Causey told the detectives that he encountered a group of people, and a man was lying on the ground. Causey said Fuzz struck the man on the head twice with a garbage can, and a man Causey referred to as Spanky kicked Epps. Causey identified a photo of Wallace as Spanky and also identified photos of Rogers and Williams.

Detective Browne testified that upon resuming work on the afternoon of April 25 for his next shift, he went to Wallace's home at

about 5:30 p.m. and brought Wallace to Area 3 for questioning. After Detective Browne and Detective Moran spoke to Wallace for about 45 minutes, they met alternately with Causey and Wallace from about 7 p.m. to 9 p.m. During that period, Causey told the detectives that Fuzz approached him and Wallace in the lot on Sedgwick Street and asked Causey and Wallace to be lookouts while he robbed a man. When Fuzz struck the man, he and Wallace kicked the man in the stomach. Fuzz hit the man in the head twice with the garbage can. Zoe also struck the victim. Fuzz went through the victim's pockets.

On cross-examination, Detective Browne said that until that conversation, Causey had not admitted to participating in Epps' murder. When they interviewed Causey from 1 to 3:30 a.m. on April 25, Causey was not under arrest and had not yet incriminated himself. Detective Browne testified that Causey said "he would stay there and help us out in this case." At some point, Causey asked to make a phone call and was allowed to call his grandmother. Detective Browne stated that Causey did not inculpate himself in Epps' murder until after 7 p.m. on April 25. The detective denied that he or Detective Moran threatened or harmed Causey or forced him to make a statement. On redirect, Detective Browne stated that Causey was the first person interviewed in connection with Epps' death and that they did not want Causey to leave because they "may never see him again." The detective said other officers were looking for Wallace during the day on April 25 while Causey was at the station.

Assistant State's Attorney Benish read Causey's statement to the jury. In the statement, Causey said he was 20 years old and that he waived his *Miranda* rights. Causey's statement was consistent with Detective Browne's testimony.

For the defense, Detective Moran testified that Causey first made an inculpatory statement at about 1 a.m. on April 25. However, on cross-examination, the detective stated that in the 1 a.m. statement, Causey only admitted to being at the scene and that he did not admit his involvement in the murder until the 7 p.m. interview that night. On redirect, Detective Moran stated that he believed an inculpatory statement was one in which a suspect "included himself in at the scene" and that inculpatory meant "inclusive." The detective stated that he did not know inculpatory was consistent with admitting guilt.

Causey testified that he was not involved in Epps' death and that his statement was coerced. Wallace's statement was substantially similar to Causey's. Wallace stated that he saw Rogers take money from Epps' pocket but did not see how much money Rogers took.

In rebuttal, Detective Moran again denied grabbing, pushing or mistreating Causey during the interrogation or promising him he

could leave if he gave a statement indicating that he kicked Epps. Following additional rebuttal testimony, the State rested. Their respective juries convicted Causey and Wallace of first degree murder and armed robbery. The trial court sentenced each defendant to 52 years for first degree murder and 20 years for armed robbery, with the sentences to be served concurrently.

■ On appeal, Causey first contends that his trial attorney was ineffective for failing to renew his motion to quash his arrest and suppress evidence in light of Detective Browne's and Detective Moran's trial testimony that Causey did not inculpate himself in Epps' murder until after 7 p.m. on April 25, approximately 19 hours after he was first questioned. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant such that the result of the proceeding would have been different.

■ Pursuant to section 114—11(g) of the Code of Criminal Procedure of 1963, a motion to suppress a confession on the ground that it was not voluntary "shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." 725 ILCS 5/114—11(g) (West 2000). A pretrial ruling on a motion to suppress is not final and may be changed or reversed at any time prior to a final judgment: *People v. Brooks*, 187 Ill. 2d 91, 127, 718 N.E.2d 88, 109 (1999). Causey's attorney filed and argued pretrial motions to quash his arrest and suppress his statement, and the trial court denied both motions.

■ When a defendant seeks relief in the appellate court to overturn the trial court's refusal to suppress his statement and the request is based on later-adduced trial evidence, the defendant can rely on trial evidence only if he renewed his suppression motion at trial and asked the court to reconsider its earlier ruling. *People v. Centeno*, 333 Ill. App. 3d 604, 620, 776 N.E.2d 629, 642 (2002), citing *Brooks*, 187 Ill. 2d at 127-28, 718 N.E.2d at 109. To successfully assert that counsel was ineffective for failing to file such a motion, the defendant must demonstrate that the motion would have been successful, thus affecting the outcome of the trial. *People v. DeLuna*, 334 Ill. App. 3d 1, 16, 777 N.E.2d 581, 595 (2002).

■ While numerous cases have involved the failure of defense counsel to file an initial motion to quash an arrest or suppress evidence, our research has unearthed no precedent specifically involving a *Strickland* claim for failure to seek the renewal or reopening during trial of a previously unsuccessful motion. Neither Causey nor

the State cites to any such specific authority. Based on *Centeno* and *Brooks*, we conclude that a defendant could successfully argue that his counsel was ineffective for failing to renew a suppression motion at trial because his attorney's omission would prevent the defendant from relying on evidence presented at trial to support his argument to this court.

Our next concern is whether Causey has presented such an argument. For Causey to prevail, he must show that his attorney was deficient in not seeking to renew or reopen the motions during trial. He also must demonstrate that had his counsel done so, the court would have granted the request and, furthermore, that the result of his trial would have been different. Therefore, Causey must show that the trial judge would have reversed his previous decision and granted the motions in light of the trial testimony.

Causey contends his pretrial motions were "doomed" until Detective Browne and Detective Moran testified at trial that he did not implicate himself in Epps' death until 7 p.m. on April 25, approximately 19 hours after he arrived at Area 3 headquarters. Prior to that testimony, Causey argues, his counsel lacked any evidence that Causey's appearance at the police station "ripened into an arrest without probable cause." We disagree.

At the suppression hearing, Detective Moran stated that police records indicated that Causey was arrested at 12:30 a.m. on April 26, approximately 24 hours after he was first questioned. Causey's attorney impeached the detective with his testimony that Causey had confessed his involvement in Epps' murder at about 1 a.m. on April 25. The trial court therefore heard testimony at the motion hearing that Causey was at Area 3 headquarters for almost a day before he gave an inculpatory statement.[2] In denying Causey's pretrial motions, the trial judge expressly considered the inconsistencies in Detective Moran's testimony and weighed the credibility of the witnesses, including Causey. Based on this record, we cannot conclude that even if Causey's counsel had moved during trial to renew the motions to quash his client's arrest and suppress his statements, the trial court would have reversed its previous rulings. If a defendant has not suffered prejudice as a result of his attorney's actions, we need not consider whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699-700, 104 S. Ct. at 2069-70. Therefore, Causey's ineffective assistance claim is rejected.

---

[2]Given that pretrial testimony, we also reject Causey's argument that the State failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

We next address the arguments that Causey and Wallace jointly raise. They first assert that the State was required to prove, as an element of felony murder, that Epps' death was foreseeable. Along with the instructions defining first degree murder and accountability, both juries also received the pattern jury instruction on felony murder:

"To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant or one for whose conduct he is legally responsible to kill the deceased, Ricardo Epps.

It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act, such as to commit armed robbery, and that the deceased was killed by one of the parties committing that unlawful act." Illinois Pattern Jury Instructions, Criminal, No. 5.03A (4th ed. 2000) (hereinafter IPI Criminal 4th No. 5.03A).

To consider this argument, it is necessary to explain the manner in which defendants were charged and the verdict forms used in this case. Each of the two juries received two verdict forms for first degree murder and two verdict forms for armed robbery pertaining to the defendant whose case it was to decide. The first degree murder forms did not specify a theory of murder, such as intentional murder or felony murder. Depending on the outcome of their deliberations, the jurors were to sign one form if they found a defendant guilty of first degree murder or sign the other form in the case of an acquittal. Each jury returned a form finding its respective defendant guilty of first degree murder. As will be discussed in greater detail later in this opinion, because the jury convicted defendants with a general first degree murder verdict form, the verdict is presumed to apply to any count in the indictment to which the proof is applicable. See *People v. Cardona*, 158 Ill. 2d 403, 411, 634 N.E.2d 720, 723 (1994). Therefore, defendants were convicted of the offense of first degree murder that carried the most culpable mental state: intentional murder. See *Cardona*, 158 Ill. 2d at 411, 634 N.E.2d at 723-24.

Defendants argue that, given the wording of the felony murder instruction and the use of the general verdict form for first degree murder, it is possible that jurors based their verdicts on a strict liability theory of felony murder, namely that, because a felony occurred, defendants were guilty of the murder committed in the course of that felony.

■ To properly preserve an issue for review, a defendant must object at trial and renew the objection in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988).

Although at the jury instruction conference Causey's attorney protested to the trial judge that IPI Criminal 4th No. 5.03A was "an improper instruction," Causey's posttrial motion does not refer to the instruction. Wallace's attempt to preserve the issue is similarly incomplete. His counsel objected to the general verdict form for murder; however, he did not specifically raise the foreseeability issue regarding the jury instruction.

■ Although a defendant's failure to object to jury instructions generally forfeits any later claim of error, a failure to properly instruct the jury can constitute plain error. *People v. James*, 331 Ill. App. 3d 1064, 1068, 773 N.E.2d 1176, 1179 (2002). A trial court is required to give correct instructions on the elements of an offense charged to ensure that the jury can properly assess the case. *James*, 331 Ill. App. 3d at 1068, 773 N.E.2d at 1179. In reviewing a defendant's claim regarding instructions, error occurs when "the jury was not adequately apprised of the State's burden of proof." *People v. Santos*, 333 Ill. App. 3d 1, 6-7, 774 N.E.2d 473, 478 (2002). Because defendants' arguments involve the validity of the jury instructions, we address them.

■ To convict a defendant of felony murder, the State must prove that, in performing the acts that caused the decedent's death, the defendant was attempting or committing a forcible felony other than second degree murder. 720 ILCS 5/9—1(a)(3) (West 2000). Defendants correctly state that Illinois observes a proximate cause theory of felony murder. See *People v. Dekens*, 182 Ill. 2d 247, 249, 695 N.E.2d 474, 475 (1998); see also *People v. Lowery*, 178 Ill. 2d 462, 465-66, 687 N.E.2d 973, 975-76 (1997) (discussing other jurisdictions' use of an agency theory for felony murder). Under the proximate cause theory, the defendant bears liability for "any death proximately related to the defendant's criminal conduct." *Dekens*, 182 Ill. 2d at 252, 695 N.E.2d at 477.

■ Defendants argue that IPI Criminal 4th No. 5.03A is flawed because it defines the offense of felony murder "in terms of strict liability." However, the wording of the instruction is accurate, precisely because felony murder *is* premised on strict liability. *People v. Hall*, 291 Ill. App. 3d 411, 420, 683 N.E.2d 1274, 1280 (1997); *People v. McCarroll*, 168 Ill. App. 3d 1020, 1023, 523 N.E.2d 150, 152 (1988) ("felony murder is based on strict liability for one who kills or is responsible for a killing during the commission of a felony"). The State is not required to prove that the defendant could foresee the death or that the defendant intended to commit murder; it merely must show that the defendant intended to commit the underlying felony. *People v. McCarty*, 329 Ill. App. 3d 969, 982, 769 N.E.2d 985, 995 (2002). As our supreme court noted in *People v. Brackett*, 117 Ill.

2d 170, 180, 510 N.E.2d 877, 882 (1987), "There are often cases in which the precise manner of death will not be foreseeable to the defendant while he is committing a felony. This does not relieve the defendant of responsibility." See also *People v. Derr*, 316 Ill. App. 3d 272, 277, 736 N.E.2d 693, 699 (2000).

■ Defendants' objections to the general verdict form are admittedly based on their assertion that the jury was not properly instructed as to felony murder. Because we have found the felony murder instruction sufficient, defendants' arguments as they relate to the verdict form are of no moment. Nevertheless, we find no error in the general verdict form for first degree murder. Illinois recognizes only one offense of murder, and the State is not required to specifically charge a defendant under the subsection denoting felony murder. *People v. Toney*, 337 Ill. App. 3d 122, 129, 785 N.E.2d 138, 144 (2003). While the jury must be unanimous with respect to a defendant's guilt or innocence of the crime charged, unanimity is not required regarding the alternate ways in which the crime can be committed. See *People v. Rand*, 291 Ill. App. 3d 431, 440, 683 N.E.2d 1243, 1249 (1997) (and numerous cases cited therein).

Moreover, *People v. Scott*, 243 Ill. App. 3d 167, 612 N.E.2d 7 (1993), on which defendants rely, is easily distinguishable. In *Scott*, the defendant was charged with three counts of delivery of a controlled substance based on separate transactions to three different undercover officers. *Scott*, 243 Ill. App. 3d at 169, 612 N.E.2d at 9. However, the jury was given only one verdict form for one count of delivery of a controlled substance. *Scott*, 243 Ill. App. 3d at 169, 612 N.E.2d at 9. In reversing the defendant's conviction, this court noted the possibility that the single form contributed to a nonunanimous guilty verdict because the jurors, in finding the defendant guilty of one count of delivery, could have based their verdict on any one of the three transactions. *Scott*, 243 Ill. App. 3d at 169, 612 N.E.2d at 9. Here, defendants each were charged with one count of murder and each jury received one verdict form for first degree murder, unlike the potentially confusing situation in *Scott*. We conclude that the jury instructions correctly defined felony murder and also that the use of a general verdict form was proper.

We next address the contention of both defendants that their 52-year sentences for first degree murder and 20-year sentences for armed robbery were excessive. In response, the State not only asks this court to affirm defendants' concurrent sentences, it further argues that the trial court should have imposed consecutive sentences under section 5—8—4 of the Unified Code of Corrections (730 ILCS 5/5—8—4 (West 1996)). The State contends that each defendant's 20-year sentence for

armed robbery should be served consecutively to his murder sentence because each defendant was guilty of multiple offenses, including the Class X felony of armed robbery, during which Epps suffered severe bodily injury. The State asks this court to remand the case to the trial court for the imposition of consecutive sentences.

█ In a joint reply brief, defendants contend that the State has forfeited the ability to request consecutive sentences by failing to do so in the trial court. Defendants attempt to circumvent our supreme court's holding in *People v. Arna*, 168 Ill. 2d 107, 658 N.E.2d 445 (1995), that a sentence that does not conform to a statutory requirement is void and may be corrected at any time. See also *People ex rel. Ryan v. Roe*, 201 Ill. 2d 552, 557, 778 N.E.2d 701, 704 (2002). The authority on which defendants rely, *People v. Capuzi*, 308 Ill. App. 3d 425, 429, 720 N.E.2d 662, 666 (1999), discusses the State's inability to object to a defendant's standing for the first time on appeal. *Capuzi* does not relate to a reviewing court's ability to correct a sentence and therefore does not contradict *Arna*.

Defendants argue that this court must examine "whether a way exists for the sentencing court to impose a concurrent sentence." We disagree that we are required to engage in such an analysis, and indeed, defendants later acknowledge that this court's role is to determine whether the trial court complied with statutory requirements in imposing concurrent sentences. In other words, our task is to assess whether Illinois law mandates consecutive sentences here, because, if that is the case, then defendants' concurrent sentences are void.

█ Generally, Illinois law prohibits consecutive sentences for multiple offenses by a defendant that were committed in a single course of conduct during which there was no substantial change in the nature of the criminal objective. 730 ILCS 5/5—8—4(a) (West 1996). The legislature has carved out two exceptions, one of which is relevant to our analysis. Under section 5—8—4(a), consecutive sentences are required when a defendant is convicted of multiple offenses, including a Class X or Class 1 felony, and the defendant inflicted severe bodily injury. 730 ILCS 5/5—8—4(a) (West 1996); *People v. Curry*, 178 Ill. 2d 509, 519, 687 N.E.2d 877, 883 (1997). Furthermore, in 1997, prior to the commission of the crimes with which defendants were charged, section 5—8—4(b) was amended to mandate consecutive sentences where the defendant was convicted of a Class X or Class 1 felony and the defendant inflicted severe bodily injury even when those offenses were not committed as part of a single course of conduct. Therefore, that amendment to the statute "had the practical effect of requiring consecutive sentences on all triggering offenses, making a determina-

tion of whether defendant's offenses were committed within a single course of conduct no longer relevant" in imposing mandatory consecutive sentences. *People v. Carney*, 327 Ill. App. 3d 998, 1001, 765 N.E.2d 1028, 1031 (2002). Simply put, consecutive sentences are required where a defendant was convicted of a Class X or Class 1 felony and where severe bodily injury was inflicted during the commission of that felony. *People v. Whitney*, 188 Ill. 2d 91, 98-99, 720 N.E.2d 225, 229 (1999). Armed robbery is a Class X felony. 720 ILCS 5/18—2(b) (West 1996). Defendants were convicted of that triggering offense and also were convicted of first degree murder.

Defendants contend that this court cannot impose consecutive sentences in the absence of a factual finding by the trial court that Epps sustained severe bodily injury. However, the death of the victim of a triggering offense can be the basis for a finding of severe bodily injury. *People v. Thompson*, 331 Ill. App. 3d 948, 956, 773 N.E.2d 15, 23 (2002); *Carney*, 327 Ill. App. 3d at 1001-02, 765 N.E.2d at 1031; *People v. Sergeant*, 326 Ill. App. 3d 974, 990, 762 N.E.2d 518, 532 (2001). In *Thompson*, the defendant and his accomplice entered a cab and, upon arriving at their destination, the defendant shot the cab driver in the back of the head and took $23 from the driver's pocket. *Thompson*, 331 Ill. App. 3d at 950, 773 N.E.2d at 18. The trial court sentenced the defendant to consecutive terms for murder and armed robbery. *Thompson*, 331 Ill. App. 3d at 950-51, 773 N.E.2d at 18. The appellate court affirmed, finding that section 5—8—4(a) required consecutive terms because "the victim's death, *i.e.*, the severe bodily injury, occurred essentially simultaneously with the armed robbery and, hence, the victim's death occurred during the commission of the triggering crime as directed by *Whitney*." *Thompson*, 331 Ill. App. 3d at 956-57, 773 N.E.2d at 23.

■ The facts of this case warrant the same result as in *Thompson*. Acting as a lookout constitutes aiding and facilitating the commission of the offense, and if that is proven, defendants are legally responsible for the crime under an accountability theory. *People v. McComb*, 312 Ill. App. 3d 589, 594, 728 N.E.2d 503, 507 (2000). Causey admitted to acting as a lookout while Rogers and Williams robbed Epps. Causey told police that while Rogers hit Epps on the head with a metal garbage drum, he and Wallace kicked Epps in the stomach. Rogers then went through Epps' pockets and, according to Wallace, retrieved money. The evidence is sufficient to support a finding that Epps' death occurred during the commission of the triggering offense of armed robbery, and therefore, consecutive sentences are mandated. See *People v. Sangster*, 91 Ill. 2d 260, 265-66, 437 N.E.2d 625, 628 (1982) (mandatory consecutive sentencing applies even when defendant is convicted

on accountability theory); *People v. Guzman*, 276 Ill. App. 3d 750, 762, 658 N.E.2d 1268, 1277 (1995); *People v. Ratzke*, 253 Ill. App. 3d 1054, 1062, 625 N.E.2d 1004, 1010 (1993).

In response to defendants' remaining assertions, it is true that consecutive sentences imposed under section 5—8—4 can constitute an impermissible double enhancement when the sentences are based on the infliction of severe bodily injury and when severe bodily injury is inherent in the triggering offense. See *People v. Phelps*, 329 Ill. App. 3d 1, 7-11, 768 N.E.2d 168, 173-77 (2002), *appeal allowed*, 201 Ill. 2d 602, 786 N.E.2d 195 (2002). However, although first degree murder currently can serve as a triggering offense under the current version of the statute,[3] that was not the case when defendants were charged. The triggering offense in this case was armed robbery, which does not contain severe bodily injury as an element. See 720 ILCS 5/18—2, 18—1 (West 1998). See also *People v. Ollie*, 333 Ill. App. 3d 971, 992-93, 777 N.E.2d 529, 546 (2002) (consecutive sentences proper when defendant was convicted of home invasion, a Class X felony, and the victim's death occurred during the commission of that offense). As in *Ollie*, the double enhancement considerations in *Phelps* are not at issue here.

We likewise reject defendants' assertions that armed robbery is a lesser included offense of intentional murder and that the armed robbery conviction should be vacated, thus precluding the imposition of consecutive sentences. Defendants argue that without their involvement in the armed robbery, they could not have been convicted of Epps' murder on an accountability theory.

An offense is a lesser included offense of another if the charged greater offense requires the jury to find a disputed factual element that is not required for conviction of the lesser offense. *People v. Novak*, 163 Ill. 2d 93, 108, 643 N.E.2d 762, 770 (1994). In *People v. Sample*, 326 Ill. App. 3d 914, 928-29, 761 N.E.2d 1199, 1210-11 (2001), this court rejected the argument that armed robbery is a lesser included offense of intentional murder. We agree with *Sample* because the opposite of the *Novak* standard is true: Armed robbery includes an element not included in intentional murder, namely, the taking of property. Thus, armed robbery cannot be an included offense of intentional murder. In conclusion, for all of those reasons, defendants' concurrent sentences are void because consecutive sentences are mandatory in this case under section 5—8—4.

Defendants' final contention on appeal is that the length of their

---

[3]Effective January 1, 2000, Public Act 91—144 added first degree murder as a triggering offense in sections 5—8—4(a) and 5—8—4(b).

individual sentences is excessive in light of their age and rehabilitative potential. Because we have concluded that defendants' 52-year sentences for murder and 20-year sentences for armed robbery must be served consecutively, their 52-year prison terms would become, in effect, 72-year terms.

The State suggests that this case be remanded to the trial court for the imposition of consecutive sentences. The appellate court can correct a void sentence at any time and is not barred from ordering consecutive terms even though that would effectively increase the defendants' sentences. See *Arna*, 168 Ill. 2d at 113, 658 N.E.2d at 448. However, it is obvious that when the trial judge sentenced defendants, he did so under the impression that the sentences would be served concurrently. Given the circumstances of this case, including the requirement that defendants' terms be served consecutively, the trial judge is in the best position to consider the aggregate sentence to be served. Defendants' convictions are affirmed, and this case is remanded to the trial court for resentencing to consecutive terms in accordance with this opinion. For that reason, we need not address defendants' assertions regarding their individual sentences.

Affirmed and remanded.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.